UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

*Caption in Compliance with D.N.J. LBR 9004-2(c)*

Ciardi Ciardi & Astin
Albert A. Ciardi, III, Esquire
Jennifer Cranston McEntee, Esquire
1905 Spruce Street
Philadelphia, PA 19103
Telephone: (215) 557-3550
Facsimile: (215) 557-3551
aciardi@ciardilaw.com
jcranston@ciardilaw.com

| | |
|---|---|
| In re:<br><br>RMG Erectors and Constructors of Montana, LLC,<br><br>Debtor. | Case No.: 26-14283<br>Judge: JNP<br><br>Chapter: 11 |

**MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR AN ORDER PERMITTING PAYMENT OF PRE-PETITION WAGES AND FOR RELATED RELIEF**

RMG Erectors and Constructors of Montana, LLC (the "Debtor") by and through proposed counsel, Ciardi Ciardi & Astin, hereby requests an order granting authority to permit payment of pre-petition wages and for related Relief (the "Motion") and in support thereof, respectfully represents:

**JURISDICTION**

1. This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue of this case is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

2. The Debtor is a Montana limited liability company with a principal place of business at 105 Blackwood-Barnsboro Road in Sewel, New Jersey 08080. Sharon Mesmer, a resident of Tennessee, is the sole member of the Debtor.

## BACKGROUND

3. The Debtor is the nation's largest and most proficient pre-engineered metal building (PEMB) erector and building provider where every worker is OSHA 30 certified.

4. The Debtor specializes in assembling and installing metal building systems that are manufactured off-site and delivered in prefabricated components. In order to complete such projects, it interprets construction plans, erects structural steel frames and ensures the building is properly aligned, secured, and competed in accordance with safety and engineering specifications on a national, state and local level.

5. The Debtor's previous customers include but are not limited to big box stores such as UHaul and Dollar General as well as The Home Depot and various airport hangers in major cities across the United States.

6. Firstrust Bank has the senior, secured position on all assets in the amount of approximately $5,800,000.00 across three (3) loans:

(a) On or about January 18, 2023, Firstrust made a commercial mortgage loan to an affiliate of the Debtor, 105 Baron, LLC, in the original principal amount of $1.125 million dollars (the "105 Baron, LLC Loan") . To secure the 105 Baron, LLC Loan, the Debtor and Sharon Mesmer signed commercial guarantees. This loan is also secured by a mortgage on the real property owned by 105 Baron, LLC located at 105 Blackwood-Barnsboro Road (the Debtor's headquarters) and 109 Blackwood-Barnsboro Road in Sewell, New Jersey (collectively, the "Sewell Property").

(b) On or about May 5, 2023, Firstrust made a purchase money term loan in the amount of $1.32 million dollars to the Debtor and an affiliate of the Debtor, RMG Aviation,

LLC, in the amount of $1.32 million dollars to finance the cost of RMG Aviation's acquisition of a private jet (a Cessna Aircraft Company Model 525 Jet Aircraft) (the "Cessna Aircraft") (the "Cessna Aircraft Loan"). To secure the Cessna Aircraft Loan, the Debtor and RMG Aviation, LLC provided Firstrust Bank with a security agreement granting it a first priority lien on the Cessna Aircraft. This loan is also secured by a guaranty and suretyship agreement signed by Sharon Mesmer.

(c) On or about March 27, 2025, Firstrust Bank made a loan to the Debtor in the form of a formula-based revolving line of credit in the maximum principal amount of $4 million dollars (the "Line of Credi"). The Line of Credit is alleged to be secured by the following collateral:

(i) a second priority mortgage on the Sewell Property;

(ii) an assignment of leases and rents on the Sewell Property;

(iii) a commercial security agreement executed by the Debtor on collateral described as inventory, chattel paper, accounts, equipment and general intangibles; and

(iv) a commercial security agreement executed by an affiliate of the Debtor, 308 Baron, LLC, on collateral described as inventory, chattel paper, accounts, equipment and general intangibles.

7. Firstrust Bank has alleged cross collateralization and cross default of the following loans: (A) RMG LOC - $4.080,894, (B) RMG Aviation - $848,436, and (C) 105 Baron Real Estate - $1,102, 738. The foregoing amounts due are taken from a pleading filed by Firstrust and are disputed by the Debtor.

8. The total collateral available securing the Firstrust Bank loans described herein, without consideration of the value of the Debtor's business as a going concern, the value of the Debtor's equipment, or the value of the assets of the other guarantors, is in excess of $6,850,000 against an alleged debt of approximately $6,032,068.

9. Finally, Firstrust Bank sent demand letters to the Debtor's customers (the "Accounts Receivable") demanding that all accounts due to the Debtor be paid immediately and directly to Firstrust Bank.

10. After receiving the demand letters from Firstrust Bank, the Debtor's customers refused payment to the Debtor (and to Firstrust Bank) and many terminated the Debtor. This action by Firstrust Bank irrevocably damaged the Debtor's business and made it impossible for the Debtor to pay its employees and continue to operate. Firstrust Bank intentionally grabbed all of the low-hanging collateral and jeopardized the Debtor's future operations and reputation. Indeed Firstrust Bank froze the Debtor's pre-petition bank accounts in the amount of approximate $355,000.00 making it impossible for the Debtor to operate and pay payroll among other things and doing irreparable harm to the Debtor's reputation in the industry.

11. Firstrust Bank filed a complaint against the Debtor, its affiliates, and Robert and Sharon Mesmer, the Debtor's CEO and sole member on April 7, 2026 in United States District Court for the District of New Jersey.

12. As of the Petition Date, the Debtor is current with its taxes, insurance, and maintenance of its assets.

13. The Debtor believes and therefore avers that Firstrust Bank is fully secured.

14. In anticipation of the Petition Date and the filing of the Motion, the Debtor contacted its current and potential clients in an effort to address the Firstrust Bank and Chapter 11 Bankruptcy issues head on. These conversations and negotiations are memorialized in the budget and projections provided by the Debtor and appended to the Cash Collateral Motion (*see* Docket No. 5). The budget represents the reignition of the Debtor's business and the reinstatement of the Debtor's employees to either continue, complete, or start various jobs and work in progress.

15. As evidenced by the Debtor's budget (Exhibit A), there is approximately $1,600,000 available after payment of the vendors and suppliers and the costs to complete the Debtor's current projects.

16. Indeed, attached as **Exhibit A** is the Debtor's cash flow budget for 30 days. The budget calls for the Debtor to pay all obligations for payroll, equipment leases, operational costs, insurance, benefits and ordinary course of business expenses. The Debtor's budget shows the Debtor can complete its existing projects and collect receivables and turn those collections into over $8,651,000 in pending orders which have a gross profit in excess of $4,057,296.

23. Firstrust Bank has an adequate equity cushion and with the non-debtor collateral referenced herein, existing guarantees, and the Debtor's existing business opportunities, is fully secured and then some.

24. The Debtor currently has 8 field employees and 6 office employees performing back-office services. The Debtor, as of March 31, 2026, had in excess of 100 employees depending on the projects in process.

25. The Debtor pays wages on the 15th and 30th of every month for the prior pay period. For example, employees paid on April 30, 2026 are paid for work done on April 1st to April 15th.

26. The Debtor owes approximately $370,000 in gross pre-petition wages primarily as a result of Firstrust Bank's sweep of the Debtor's pre-petition bank accounts. ADP is owed another $143,203.76 for payroll advanced pre-petition.

27. To the extent the Debtor receives approval to restart projects from the Court and owners as well as the continued use of cash on an interim basis, the Debtor will bring back field staff. The Debtor desires to pay returning field staff any unpaid wages and benefits upon recall.

28. This process will allow the Debtor to maintain employee morale and keep its dedicated and skilled workforce.

29. Finally, to maintain employee morale and preserve the Debtor's workforce at this critical time, to reduce the disruption caused by the bankruptcy filings on the Debtor's business operations, and to minimize the personal hardship the Debtor's employees will suffer if its employee-related obligations are not paid when due, the Debtor requests entry of an order authorizing, but not requiring, the Debtor (a) to pay, in the ordinary course of business, all prepetition employee compensation and employee benefits earned prior to the Petition Date; (b) to honor and take all necessary actions to continue in the ordinary course of business until further notice (but not to assume), certain employee-related programs, policies and plans that were in effect as of the filing of these chapter 11 cases; and (c) to make, in the ordinary course of business, all normal and customary deductions and withholdings and pay all taxes associated with the Debtor's obligations to employees.

30. By this motion, the Debtor does not seek authorization to assume any contracts relating to senior executives currently employed by the Debtor. Further, the Debtor does not seek to pay any pre-petition compensation or other amounts to executives, amounts due in connection with the continuation of the employee benefits described herein, and expense reimbursement amounts, all in accordance with existing plans, policies, and programs.

31. As of the Petition Date, the Debtor employs approximately __ employees (the "Employees"). The Debtor's next payroll, payable on April 30, 2026 for work done April 1st through April 15th, is $80,000.00.

32. The Debtor's next scheduled payroll is May 15, 2026 of which payroll will include two days of pre-petition wages (April 16th and April 17th) in the amount of $20,000.00 (together with the pre-petition payroll accruing from April 1-15, 2026, the "Pre-Petition Payroll").

33. As of the Petition Date, the Debtor estimates that it owes its employees approximately $370,000 in unpaid, gross wages accruing prior to April 1, 2026 (the "Unpaid Compensation").

34. The Debtor hereby seeks authority to pay Unpaid Compensation as cash permits and as employees return to work. The Debtor does not believe that the Unpaid Compensation payable to any one employee exceeds $17,150. No officer or shareholder will receive unpaid pre-petition compensation but will be paid for post-petition services. The Debtor hereby seeks authority to pay the Pre-Petition Payroll in a timely manner on April 30, 2026 and again on May 15, 2026 as detailed herein.

35. The Debtor maintains various plans and policies to provide employees with the following benefits: (1) the Debtor matches (for office employees, only) an employee's 401k contribution up to 4% of the employee's salary, (2) the Debtor reimburses employees (office employees only) 70% of their health and prescription insurance premiums for individual coverage, and (3) the Debtor provides workers compensation insurance for all employees (collectively the "Employee Benefits"). The Debtor wishes to continue offering the Employee Benefits to the Employees and their families. Any failure to pay the Employee Benefits would be injurious to employee welfare, morale and expectations. The Debtor is current on monies owed under the various Employee Benefit programs except that it needs to contribute its 401k match for three (3) employees for the March 31st and April 15th pre-petition payrolls.

36. The Debtor does not believe, at present, that any of its employees are owed aggregate amounts for services rendered prior to the Petition Date in excess of the $17,150 amount to which such employees would be entitled with administrative priority under section 507 of the Bankruptcy Code. The Debtor urges the Court to approve the payment of the amounts owed to the Debtor's employees, given the critical nature of the employees to the Debtor's businesses, as stated above. The Debtor believes that failure to pay the employees for their pre-petition services in full would have grave consequences for the Debtor's ability to function in the future.

37. The Debtor hereby seeks authority to pay all Employee Benefits in the ordinary course of business. The Debtor also seeks authority to continue the Employee Benefits programs after the Petition Date.

38. As a result of the commencement of the Debtor's chapter 11 bankruptcy case, and in the absence of an order of the Court providing otherwise, the Debtor will be prohibited from paying or otherwise satisfying its prepetition obligations regarding the Pre-Petition Payroll, Unpaid Compensation and Employee Benefits (collectively, the "Prepetition Employee Obligations"), and the checks, wire transfers and direct deposit transfers issued in respect of the Prepetition Employee Obligations will be dishonored.

39. Accordingly, pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code and the "necessity of payment" doctrine, the Debtor seeks authority to; (i) pay its outstanding Prepetition Employee Obligations; and (ii) continue its practices, programs and policies in effect as of the Petition Date with respect to the Prepetition Employee Obligations.

40. The payment of the Prepetition Employee Obligations is justified under Section 105(a) of the Bankruptcy Code and the well-established "necessity of payment doctrine." The Debtor believes that the amounts they seek to pay are entitled to priority under Sections 507(a)(3) and (a)(4) of the Bankruptcy Code, with very few conditional exceptions.

41. Under the "necessity of payment doctrine" and Section 105(a) of the Bankruptcy Code, courts have consistently permitted immediate payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors, specifically including payment of prepetition claims of employees. <u>See</u>, <u>e.g.</u>, <u>Miltenberger v. Logansport Ry. Co.</u>, 106 U.S. 286, 312 (1882) (stating that payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of . . . [crucial] business relations"); <u>Gregg v. Metro. Trust Co.</u>, 197 U.S. 183, 187 (1905) (stating that "the payment of the employees of the [rail]road is more certain to be necessary in order to keep it running than the payment of

any other class of previously incurred debts."); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989) (finding that payment of prepetition wages, salaries, reimbursable business expenses and health benefits to active employees of debtor airline authorized); In re Chateaugay Corp., 80 B.R. 279, 286-88 (S.D.N.Y. 1987), appeal dismissed, 838 F.2d 59 (2d Cir. 1988) (approving lower court order authorizing debtor, prior to plan stage of case, to pay prepetition wages, salaries, expenses and benefits); In re Gulf Air, Inc., 112 B.R. 152, 153-54 (Bankr. W.D. La. 1989) (permitting payment of prepetition wages, benefits and expenses as necessary to maintain going concern values and to assist reorganization efforts).

42. The continued operation of the Debtor's business depends on the retention and motivation of its Employees. The Debtor believes that, to avoid employee resignations and to maintain employee morale, it is critical that it is authorized to pay each of its employees all compensation amounts that have been earned under the Debtor's prepetition contractual obligations or practices.

43. It is equally essential that the Debtor take all actions reasonably necessary to continue on an uninterrupted basis in the ordinary course of business all of the employment policies that were in effect prior to the Petition Date. Payment of these obligations and the continuation of all of these programs and policies are essential to ensure that the Debtor retain its employees and maintain employee morale.

44. Moreover, the Debtor estimates that the amounts it seeks to pay herein are entitled to priority under Sections 507(a)(3) and (a)(4) of the Bankruptcy Code, with very few conditional exceptions. Section 507(a)(3) of the Bankruptcy Code grants priority to employee claims for "wages, salaries, or commissions, including vacation, severance and sick leave pay"

earned within ninety days before the filing of the applicable petition up to $17,150 per employee. Similarly, section 507(a)(4) of the Bankruptcy Code provides that claims for contributions to certain employee benefit plans are also afforded priority treatment to the extent of the number of employees covered by each plan multiplied by $17,150, less any amounts paid pursuant to Section 507(a)(3) of the Bankruptcy Code.

45. Thus, granting the relief sought herein would affect only the timing and not the amount of payment of the Prepetition Employee Obligations to the extent they constitute priority claims. Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees will be exposed to significant financial and health-related problems if the Debtor is not permitted to pay certain of the unpaid expenses and Prepetition Employee Obligations, particularly wages and other Employee Benefits. Moreover, the Debtor believes that if it is unable to honor the Prepetition Employee Obligations, employee morale and loyalty will be jeopardized at a time when it is most critical. If the Debtor is not authorized to pay for the Employee Benefits, then many of the Employees may not be reimbursed or otherwise have their health benefit claims paid. In addition, certain Employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed, and may face having their health care services terminated. The Debtor believes that such uncertainty will cause significant anxiety at precisely the time the Debtor needs its Employees to perform their jobs at peak efficiency.

**WHEREFORE** the Debtor respectfully requests the Court grant the Motion, allowing it to pay, pursuant to the process outlined in the Motion, the Pre-Petition Employee Obligations and grant such other and further relief as the Court deems just and necessary.

Respectfully submitted,

CIARDI CIARDI & ASTIN

Date: April 20, 2026

*<u>/s/ Jennifer C. McEntee</u>*

Albert A. Ciardi, III, Esquire
Jennifer Cranston McEntee, Esquire
1905 Spruce Street
Philadelphia, PA 19103
Telephone: (215) 557-3550
Facsimile: (215) 557-3551

***Proposed Counsel for the Debtor***