| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY *Caption in Compliance with D.N.J. LBR 9004-2(c)* Ciardi Ciardi & Astin Albert A. Ciardi, III, Esquire Jennifer Cranston McEntee, Esquire 1905 Spruce Street Philadelphia, PA 19103 Telephone: (215) 557-3550 Facsimile: (215) 557-3551 aciardi@ciardilaw.com jcranston@ciardilaw.com | |
| In re: RMG Erectors and Constructors of Montana, LLC, Debtor. | Case No.:   26-14283 Judge:      JNP Chapter:    11 |

## MEMORANDUM OF LAW IN SUPPORT OF DEBTOR'S MOTION FOR AUTHORITY TO USE CASH COLLATERAL AND PAY PRE-PETITION SUBCONTRACTORS

RMG Erectors and Constructors of Montana, LLC ("Debtor" or "RMG") by and though counsel submits this Memorandum of Law in Support of the Debtor's Motion for Use of Cash Collateral and its Motion for the Authority to Pay Pre-Petition Subcontractor Claims.   The Debtor has also filed a Motion to Permit Payment of Pre-Petition Wages with its own Memorandum of Law.  The Debtor filed its Petition on April 17, 2026.

## I.    INTRODUCTION

The Debtor is the nation's largest and most proficient pre-engineered metal building (PEMB) erector and building provider where every worker is OSHA 30 certified.  The Debtor specializes in assembling and installing metal building systems that are manufactured off-site and delivered in prefabricated components.  In order to complete such projects, it interprets construction plans, erects structural steel frames and ensures the building is properly aligned, secured, and competed in accordance with safety and engineering specifications on a national,

1

state and local level. The Debtor's previous customers include but are not limited to big box stores such as UHaul and Dollar General as well as The Home Depot and various airport hangers in major cities across the United States.

As a construction company, the Debtor executes contracts with its project owners and general contractors that provide that all of the Debtor's subcontractors and suppliers on any project must be paid before the Debtor is entitled to any proceeds. The Debtor has prepared an analysis of its existing contracts which identifies which subcontractors are unpaid and must be paid in order for the Debtor to collect the accounts receivable.

Firstrust Bank shut down the Debtor two weeks ago by sending letters to the Debtor's customers, project owners. By sending those letters, the project owners had the right to withhold all payments, pay subcontractors directly, possibly replace the Debtor and issue back charges. Once the Debtor's access to its accounts receivable was terminated, the Debtor laid off all but a skeleton crew of employees and continues to secure, insure and maintain the Collateral. The Debtor has filed Chapter 11 to take control of the projects back and finish the work which will generate more than the zero recovery that Firstrust is now facing. The Debtor also has substantial new profitable work which it can complete assuming it has access to cash and the ability to pay its subcontractors and suppliers. In addition to sending letters to its customers, Firstrust seized the Cessna Aircraft (valued at 1.6 million) and $350,000.00 of cash. The Collateral for the Firstrust Bank loans is valued in excess of $6,850,000.00 against an alleged Firstrust Bank debt of $6,032,068.00. Firstrust Bank is oversecured and the Debtor, with access to its Accounts Receivables and as evidenced by the Cash Collateral Budget, can turn a profit almost immediately. Firstrust Bank's actions are to the detriment of the Debtor, its employees, and its customers as well as its reputation and operations. It is for these reasons as well as the

2

following memorandum of law and those arguments outlined in the Debtor's Motion and Certification of Robert Mesmer, that the Debtor asks the Court to permit its use of cash collateral on an interim basis and over the objection, if any, of Firstrust Bank. The Debtor also requests the Court grant its Motion for authority to pay its pre-petition Subcontractors for the following reasons.

## II.    **FACTUAL BACKGROUND**

Firstrust Bank has the senior, secured position on all assets in the amount of approximately $5,800,000.00 across three (3) loans:

(a)     On or about January 18, 2023, Firstrust made a commercial mortgage loan to an affiliate of the Debtor, 105 Baron, LLC, in the original principal amount of $1.125 million dollars (the "105 Baron, LLC Loan") . To secure the 105 Baron, LLC Loan, the Debtor and Sharon Mesmer signed commercial guarantees.  This loan is also secured by a mortgage on the real property owned by 105 Baron, LLC located at 105 Blackwood-Barnsboro Road (the Debtor's headquarters) and 109 Blackwood-Barnsboro Road in Sewell, New Jersey (collectively, the "Sewell Property").

(b)     On or about May 5, 2023, Firstrust made a purchase money term loan in the amount of $1.32 million dollars to the Debtor and an affiliate of the Debtor, RMG Aviation, LLC, in the amount of $1.32 million dollars to finance the cost of RMG Aviation's acquisition of a private jet (a Cessna Aircraft Company Model 525 Jet Aircraft) (the "Cessna Aircraft") (the "Cessna Aircraft Loan"). To secure the Cessna Aircraft Loan, the Debtor and RMG Aviation, LLC provided Firstrust Bank with a security agreement granting it a first priority lien on the Cessna Aircraft.  This loan is also secured by a guaranty and suretyship agreement signed by Sharon Mesmer.

3

(c)      On or about March 27, 2025, Firstrust Bank made a loan to the Debtor in the form

of a formula-based revolving line of credit in the maximum principal amount of $4 million

dollars (the "Line of Credit").  The Line of Credit is alleged to be secured by the following

collateral:

      (i)      a second priority mortgage on the Sewell Property;

      (ii)     an assignment of leases and rents on the Sewell Property;

      (iii)    a commercial security agreement executed by the Debtor on collateral

           described as inventory, chattel paper, accounts, equipment and

           general intangibles; and

      (iv)     a commercial security agreement executed by an affiliate of the Debtor,

           308 Baron, LLC, on collateral described as inventory, chattel paper,

           accounts, equipment and general intangibles.

Firstrust Bank has alleged cross collateralization and cross default of the following loans:

(A) RMG LOC - $4.080,894, (B) RMG Aviation - $848,436, and (C) 105 Baron Real Estate -

$1,102, 738.  The foregoing amounts due are taken from a pleading filed by Firstrust and are

disputed by the Debtor.  Thereafter, Firstrust Bank exercised its rights under various loan

documents, including an aviation security agreement and the Uniform Commercial Code (its

filed UCC) and took possession of the Cessna Aircraft on March 31, 2026. The Cessna Aircraft

is estimated to be worth approximately $1.6 million dollars. Firstrust Bank also seized the

Debtor's accounts held at Firstrust Bank in the amount of $350,000.00. Finally, Firstrust Bank

sent demand letters to the Debtor's customers (the "Accounts Receivable") demanding that all

accounts due to the Debtor be paid immediately and directly to Firstrust Bank. The real estate

securing the 105 Baron loan has a value exceeding $3,300,000. The total collateral available

4

securing the Firstrust Bank loans described herein, without consideration of the value of the Debtor's business as a going concern, the value of the Debtor's equipment, or the value of the assets of the other guarantors, is in excess of $6,850,000 against an alleged debt of approximately $6,032,068.

After receiving the demand letters from Firstrust Bank, the Debtor's customers refused payment to the Debtor (and to Firstrust Bank) and many terminated the Debtor. This action by Firstrust Bank irrevocably damaged the Debtor's business and made it impossible for the Debtor to pay its employees and continue to operate. Firstrust Bank intentionally grabbed all of the low-hanging collateral and jeopardized the Debtor's future operations and reputation. Firstrust Bank filed a complaint against the Debtor, its affiliates, and Robert and Sharon Mesmer, the Debtor's CEO and sole member on April 7, 2026, in United States District Court for the District of New Jersey. As of the Petition Date, the Debtor is current with its taxes, insurance, and maintenance of its assets.

## III.    ARGUMENT

Firstrust Bank is over-secured and is currently holding the Cessna Aircraft (approximate value $1.6 million dollars) and the Debtor's Firstrust Bank accounts ($350,000.00) and also receiving further adequate protection in the form of replacement liens, superpriority claims, perfection of liens, and the continued insurance, security and maintenance of the Collateral. Because Firstrust Bank is over-secured and the Debtor will prove it not only maintains a substantial equity cushion but also, with the use of the Accounts Receivable, can be profitable, as well as the fact that the ultimate benefit to be achieved by a successful reorganization inures to *all* creditors of the case (not just Firstrust Bank), a fair opportunity must be given to the Debtor to achieve such a result. It is for these reasons as well as those outlined in the following

5

argument that the Motions should be granted over the anticipated objection of Firstrust Bank.

### A.      Standard

Under § 363(c)(2), a debtor may not use cash collateral unless consent is obtained from creditors that have an interest in the collateral, or the bankruptcy court authorizes its use. *In re GVM, Inc.*, 605 B.R. 315, 324–25 (Bankr. M.D. Pa. 2019). If the creditor does not consent, cash collateral may be used by the debtor only to the extent that the court determines that the creditor's interest in the collateral is adequately protected. *Id.* (*citing* 11 U.S.C. § 363(e)). "Cash collateral" includes cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property. *Id.* (*citing* 11 U.S.C. § 363(a)).

Adequate protection is not defined in the Code, but § 361 provides three non-exclusive methods as examples of same: (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the indubitable equivalent of the secured creditor's interest. *Id.* (*citing* 11 U.S.C. § 361). "When devising a proposal for adequate protection of a secured creditor's interest, the proponent 'should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.' " *Id.* (*citing In re Hari Ram, Inc.*, 507 B.R. 114, 120 (Bankr. M.D. Pa. 2014) (quoting *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir. 1984), (quoting *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994))). The burden of proof is on the debtor to demonstrate that the secured creditor is adequately protected for the purpose of using its cash collateral. *Id.* (*citing Hari Ram*, 507 B.R. at 120; § 363(p)(1)).

A bankruptcy court should apply the following standard when determining whether a

debtor should be permitted to use cash collateral: (1) The court must establish the value of the secured creditor's interest; (2) The court must identify risk to the secured creditor's value resulting from the debtor's request for use of cash collateral; and (3) The court must determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence. *Id.* (*citing Hari Ram*, 507 B.R. at 125 (citing *Martin v. United States (In re Martin)*, 761 F.2d 472, 476–77 (8th Cir. 1985)).

### B. Firstrust Bank's Interests are Adequately Protected, such that the Continued Use of Cash Collateral is Appropriate

The first step of the adequate protection standard requires the court to determine the "value of the secured creditor's interest." *In re GVM, Inc.*, 605 B.R. 315, 325 (Bankr. M.D. Pa. 2019) (*citing Hari Ram*, 507 B.R. at 125). That value is nothing more than the "interest of an entity in property." *Id.* (*citing* 11 U.S.C. § 361; *see In re Aegean Fare, Inc.*, 33 B.R. 745 (Bankr. D. Mass. 1983), order modified on other grounds, 34 B.R. 965 (Bankr. D. Mass. 1983)). The "interest of an entity in property," in turn, is not measured by the amount of the claim but is instead measured by the value of the protected entity's interest in the property involved. *Id.* (*citing In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982); *Aegean Fare*, 33 B.R. at 745). Regarding secured creditors, adequate protection is therefore intended to protect only that portion of the secured creditor's claim that is secured and not the portion that is unsecured. *Id.* (*citing In re Philadelphia Consumer Discount Co.*, 37 B.R. 946 (E.D. Pa. 1984)). These well-established principles make it clear that the right to adequate protection is limited to the lesser of the value of an entity's interest in collateral or the amount of the entity's claim. *Id.* (*citing In re Aegean Fare, Inc.*, 33 B.R. at 745).

It is well established that an interest in property may be deemed to be adequately

7

protected where the property is not depreciating. *Id.* (citing *In re Weinstein*, 227 B.R. 284 (9th

Cir. BAP 1998); *see also In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y.

1982); *In re Orlando Trout Creek Ranch*, 80 B.R. 190 (Bankr. N.D. Cal. 1987)). It is equally

clear that when assessing the risk to a secured creditor's interest in collateral, most courts engage

in an analysis of the property's equity cushion, which is the value of the property after deducting

the claim of the creditor and all senior claims. *Id.* (citing *In re Las Torres Dev., L.L.C.*, 413 B.R.

687, 696–97 (Bankr. S.D. Tex. 2009) (citations omitted)). An equity cushion is the surplus of

value remaining after the amount of indebtedness is subtracted from the fair market value of the

property securing same. *Id.* (*citing Com. Of Pennsylvania State Emp. Retirement Fund v. Roane*,

14 B.R. 542 (E.D. Pa. 1981)). The amount of encumbrances junior to that of the secured creditor

in question should not be considered. *Id.* (*citing In re Nashua Trust, Co.*, 73 B.R. 423 (Bankr.

D.N.J. 1987); *see* *327 In re James Wilson Assoc.*, 965 F.2d 160, 171 (7th Cir. 1992); *In re

Markos Gurnee P'ship.*, 252 B.R. 712, 716–17 (Bankr. N.D.Ill 1997)).

Here, Firstrust Bank's interests are adequately protected. Across all of the Firstrust Bank

loans to the Debtor and its affiliates, Firstrust Bank is currently holding the Cessna Aircraft and

$350,000.00 cash. Firstrust Bank is also secured by the Sewell Property worth in excess of

$3,300,000.00 and access to the Debtor's Accounts Receivable. On top of these itemized pieces

of collateral, the Debtor has value as a going concern, the Debtor's equipment has value, and the

guarantees to the Firstrust Bank loans have value. Firstrust Bank also receives Replacement

Liens under the Cash Collateral Orders among other valuable protective measures such as

insurance, security and maintenance of the Collateral. The Debtor continues to insure, secure

and maintain Firstrust Bank's Collateral and possesses a substantial equity cushion. It is for

these reasons that the Motion should be granted.

8

i.    **The Debtor's Equity Cushion is Sufficient in Scope and Tenacity to be Considered Adequate Protection for the Purpose of Protecting the Collateral.**

An equity cushion is a "surplus of value remaining after the amount of indebtedness is subtracted from the fair market value of the collateral." *Commonwealth of Pa. State Employees Retirement Fund v. Roane*, 14 B.R. 542, 545 (E.D.Pa. 1981). For example, in *In re: Grant Broadcasting of Philadelphia, Inc.*, 75 B.R. 819 (E. D. Pa. 1987), the equity cushion was the balance remaining after subtracting the amount of the lender's security interests at the time of the Bankruptcy Court's decision was made from the fair market value of Debtors' television stations at that same time. *In re Broadcasting*, 75 B.R. at 824. As the Bankruptcy Court noted, "there appears to be no dispute among the parties that an 'equity cushion' if sufficient in size and unlikelihood of erosion may constitute, in itself, adequate protection." *Id.* 71 Bankr. at 386; *see also*, *In re Mellor*, *supra*, 734 F.2d at 1400; *Commonwealth of Pa. State Employees Retirement Fund v. Roane*, *supra*, 14 B.R. at 544-45; *In re Liona Corp.*, 68 Bankr. 761, 767 (Bankr. E.D.Pa., 1987); *In re Curtis*, 9 B.R. 110, 112 '](Bankr. E.D.Pa. 1981).

Whether an equity cushion provides "adequate protection," sufficient to defeat creditor's motion for relief from stay, is question to be determined on case-by-case basis rather than by mechanical application of formula. *In re Kost*, 102 B.R. 829 (D.Wyo.1989). *In re Mediterranean Assocs., L.P.* provides, "Courts have uniformly held that a creditor is entitled to relief from the automatic stay where the equity cushion in the collateral is less than 11%." *In re Mediterranean Assocs., L.P.*, No. CIV. A. 93-MC-304, 1993 WL 541671, at *2 (E.D. Pa. Dec. 29, 1993) *(citing In re: Kost*, 102 B.R. 829 (D. Wyo.1989); *In re: Liona Corp., N.V.*, 68 B.R. 761 (Bankr.E.D.Pa.1987)).

Based upon the most minimum values presented, there is a substantial equity cushion.

9

> ii.     **The Debtor's Budget and Certification of Robert Mesmer as
> well as the anticipated Testimony of Robert Mesmer is
> Evidence it is Cashflow Positive.**

In anticipation of the Petition Date and the filing of the Motion, the Debtor contacted its

current and potential clients in an effort to address the Firstrust Bank and Chapter 11 Bankruptcy

issues head on.  These conversations and negotiations are memorialized in the budget and

projections provided by the Debtor and appended to the Motion.  The budget represents the

reignition of the Debtor's business and the reinstatement of the Debtor's employees to either

continue, complete, or start various jobs and work in progress. As evidenced by the Debtor's

budget (Exhibit A), there is approximately $1,600,000 available after payment of the vendors

and suppliers and the costs to complete the Debtor's current projects. Indeed, attached as **Exhibit**

**A** to the Cash Collateral Motion is the Debtor's cash flow budget for 30 days.  The budget calls

for the Debtor to pay all obligations for payroll, equipment leases, operational costs, insurance,

benefits and ordinary course of business expenses.  The Debtor's budget shows the Debtor can

complete its existing projects and collect receivables and turn those collections into over

$8,651,000 in pending orders which have a gross profit in excess of $4,057,296.  Based on the

foregoing, Firstrust Bank has an adequate equity cushion and with the non-debtor collateral

referenced herein, existing guarantees, and the Debtor's existing business opportunities, is fully

secured and then some.

> C.     **The Debtor Should be Granted Permission to Pay Pre-petition
> Subcontractors.**

The Debtor is a steel erection subcontractor.  Its own primary subcontractors are steel

suppliers and crane leasing companies.  The Debtor does business in multiple states.  Regardless

of the different laws in different states, the Debtor's contracts permit the contracting

counterparty, either a project owner or general contractor, to withhold payment until (a) the

project is complete and (b) all subcontractors and suppliers of the Debtor are paid.  At trial, the Debtor will introduce the contracts with its owners and general contractors which will prove this point.  Unless permission is granted to pay those subcontractors, the Debtor (and the estate and Firstrust) will receive no proceeds of the Accounts.

There is no provision of bankruptcy law or New Jersey state law, or any applicable state law, which provides a different result.  The United States Court of Appeals for the Third Circuit in *In re Linear Electric Company, Inc.* while not faced with the direct issue, discussed that such a provision would have rendered the lien fund as zero.  852 F.3d 313, 324 (3d Cir. 2017).  The issues regarding mechanics liens and post-petition filing that *Linear* discussed are not implicated here because the issue before the Court here is the contractual right of the owner to direct pay.  The Debtor does not want to interfere with that right.  The Debtor requests the authority to honor it but in a way that allows the Debtor to complete the project and maximize the collection of the accounts.  Here, the owners and general contractors have exercised their rights to withhold payments until subcontractors are paid.  Those contract rights sit with the owners and general contractors.  *In re Midway Inc.*, 166 B.R. 585, 594-95 (Bankr. D.N.J. 1994).  The Debtor simply seeks to provide for the orderly payment of subcontractors so that it can complete the projects and collect the accounts which will only enhance the collateral of Firstrust Bank.

## IV.   CONCLUSION

In sum, the adequate protection analysis is a factual determination that must be determined flexibly based upon the facts of the individual case.  The entire purpose of providing adequate protection for a creditor is to ensure that the creditor receives the value for which it bargained pre-petition.  *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).  Because the ultimate benefit to be achieved by a successful reorganization inures to all creditors of the case, a

11

fair opportunity must be given to the debtor to achieve such a result. In order to encourage a Debtor's efforts during the formative period prior to the proposed reorganization, a Court must be flexible in applying the adequate protection standard. *Id.* at 1398. Firstrust Bank is well over-secured. The default provisions in the Cash Collateral Order keeps the Debtor on the tightest leash possible. Firstrust Bank is receiving the benefit for its bargain and should not be permitted to completely and irrevocably upend the Debtor's operations because it is impatient. Therefore, the Debtor asks the Court to grant the Motion and the interim Cash Collateral Order, allowing the Debtor the grace period it needs to continue operations and formulate a plan of reorganization that provides a return beyond that which Firstrust Bank seeks.

**CIARDI CIARDI & ASTIN**


*/s/ Jennifer E. Cranston*
Albert A. Ciardi, III, Esquire
Jennifer E. Cranston, Esquire
1905 Spruce Street
Philadelphia, PA 19103
(T) (215) 557-3550
(F) (215) 557-3551
aciardi@ciardilaw.com
jcranston@ciardilaw.com
Counsel for the Debtor

Date:   April 20, 2026